**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| and | ) Civil Action No. 26-271 |
| | ) |
| LOUISIANA DEPARTMENT OF | ) **COMPLAINT** |
| ENVIRONMENTAL QUALITY, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) |
| E.R.R. LLC, | ) |
| | ) |
| Defendant. | ) |
| | ) |

The United States of America, on behalf of the United States Environmental Protection Agency (EPA), and the Louisiana Department of Environmental Quality (LDEQ), acting with the concurrence of the Louisiana Attorney General, bring this complaint for civil penalties and injunctive relief against E.R.R. LLC (ERR) for violations of the Clean Water Act (CWA) and Louisiana Environmental Quality Act (LEQA) at ERR's centralized wastewater treatment facility.

## INTRODUCTION

1.    ERR operates a centralized wastewater treatment facility (the "Facility") in Belle Chasse, Louisiana, on the west bank of the Mississippi River.  The Facility was intended to receive wastewater from various industrial sources, treat the wastewater through biological and mechanical processes, and discharge the treated wastewater into the Mississippi River.

2.    Under the CWA and LEQA, ERR was authorized to discharge wastewater from the Facility only if it did so in compliance with a Louisiana Pollutant Discharge Elimination

1

System (LPDES) permit issued for the Facility by the State of Louisiana. From November 1, 2017, until at least January 26, 2023, ERR operated under its most recent permit, Permit No. LA0125750 (the "Permit"). The Permit allowed ERR to treat and discharge certain categories of wastewater subject to a variety of requirements and conditions.

3.     Among other categories of wastewater, the Facility treated and stored large quantities of wastewater containing oil, such as marine bilge water and industrial oily water. During the treatment process, the Facility would separate out and recover oil from the wastewater, which it then stored on site for future sale and distribution.

4.     Because of the Facility's close proximity to the Mississippi River and the large quantities of oily water and oil stored on the premises, the Facility was subject to federal Spill Prevention, Control, and Countermeasure (SPCC) regulations and Facility Response Plan (FRP) regulations, found at 40 C.F.R. Part 112, which were promulgated under the CWA. The Facility was also subject to analogous Louisiana Spill Prevention and Control (SPC) regulations promulgated under the LEQA.

5.     The SPCC and SPC regulations required ERR to, among other things, develop and implement written spill prevention plans according to requirements designed to prevent and control oil spills. Facilities may satisfy federal SPCC and Louisiana SPC requirements together in a single combined SPCC/SPC Plan. Likewise, FRP regulations required ERR to prepare and submit an FRP according to requirements designed to demonstrate a facility's preparedness to respond to a worst-case oil discharge.

6.     On April 13, 2022, ERR submitted an application to LDEQ to renew the Permit, which triggered an automatic, administrative extension of the Permit. The Permit is still in effect because of that administrative extension.

7.      From January 24, 2023, through January 26, 2023, inspectors from EPA and LDEQ conducted an unannounced inspection of the Facility.  During the inspection and subsequent investigation, the inspectors discovered numerous violations of the Permit by ERR, as well as violations of SPCC, SPC, and FRP regulations.  The violations included the following:

- ERR discharged more than 5 million gallons of wastewater without conducting analysis of the wastewater to determine compliance with "effluent limitations," that is, provisions that specify the quantities of enumerated pollutants that may be discharged under the Permit.  ERR also failed to report these discharges in required Discharge Monitoring Reports (DMRs).

- ERR bypassed key components of its treatment system—namely, the Facility's "receiving tank" and a "biodigester"—for 21 months and 12 months, respectively, and failed to properly operate and maintain those components, in violation of the Permit.  ERR's failure to properly maintain the treatment system was demonstrated by, among other things, a visibly polluted sample taken from the outfall tank (the final point before discharge) during the inspection.

- ERR repeatedly reported false amounts of discharged wastewater on its DMRs, which were often wrong by several orders of magnitude and had no relation to the actual quantities of wastewater that ERR discharged from the Facility.

- ERR accepted and discharged types of wastewater that were not authorized for discharge under the Permit, including a toxic herbicide.

- ERR violated the Permit's testing and analysis requirements by running treated wastewater through an additional filter before sampling, so that the sampled wastewater was not representative of the wastewater that was being discharged. In addition, ERR failed to conduct visual observations at the discharge point to monitor for possible oil sheen in the river.

- ERR failed to prepare and submit a Facility Response Plan to EPA.

- ERR's SPCC/SPC Plan failed to satisfy regulatory requirements, and ERR failed to put in place controls and countermeasures required under the SPCC and SPC regulations, including secondary containment for several large storage tanks to prevent discharge of oil in the event of a leak or spill from those tanks.

8.      At some point following the inspection, ERR suspended operations.  ERR remains registered as a going business with the Louisiana Secretary of State, and large quantities of oil and wastewater continue to be stored and are capable of discharge at the Facility.  Heavy

construction equipment also remains on the premises, and ERR could immediately resume operations under the Permit.

9.      Based on the violations summarized above and described further below, the United States of America and LDEQ bring this complaint against ERR for civil monetary penalties and injunctive relief under the CWA and LEQA.

## PARTIES

10.      Plaintiffs are the United States of America, acting at the request of EPA, and LDEQ.

11.      ERR is a limited liability company located in Louisiana.  ERR is the owner and operator of the Facility, which is located at 9875 Highway 23, Belle Chasse, Louisiana 70037, on the west bank of the Mississippi River near mile marker 74.  According to Louisiana Secretary of State records, ERR's physical address is the Facility's address, and Andrew Frisard and Hugh L. Nungesser Jr. are the only registered members of the LLC.

## JURISDICTION AND VENUE

12.      This Court has jurisdiction over the subject matter of this action under Section 309(b) of the CWA, 33 U.S.C. § 1319(b), and 28 U.S.C. §§ 1331, 1345, and 1355.  The Court has jurisdiction over Louisiana's state law claims under 28 U.S.C. § 1367, because those claims are so related to the United States' federal claims that they form part of the same case or controversy.

13.      This Court has personal jurisdiction over the defendant and venue is proper in this District under 33 U.S.C. § 1319(b) and 28 U.S.C. §§ 1391(b), 1391(c), and 1395(a), because ERR is located and does business in this District and the events giving rise to this action occurred in this District.

14.     Authority to bring this action on behalf of the United States is vested in the

United States Department of Justice under 33 U.S.C. § 1366 and 28 U.S.C. §§ 516 and 519.

15.     LDEQ has authority to bring this action and claims under the LEQA by acting

with the concurrence of the Louisiana Attorney General.  La. R.S. § 30:2025.

## STATUTORY AND REGULATORY BACKGROUND

**I.    The Clean Water Act Prohibits the Discharge of Any Pollutant Except in Compliance with an NPDES Permit**

16.     Congress enacted the CWA "to restore and maintain the chemical, physical, and

biological integrity of the Nation's waters." 33 U.S.C. § 1251(a).

17.     To achieve that objective, Section 301(a) of the CWA, 33 U.S.C. § 1311(a),

prohibits the "discharge of any pollutant by any person" except in compliance with a National

Pollutant Discharge Elimination System (NPDES) permit issued by EPA or through an EPA-

approved state program.

   a.  "Person" is defined to include an "individual, corporation, partnership, [or] association." 33 U.S.C. § 1362(5).

   b.  "Pollutant" is defined to include "dredged spoil, solid waste, incinerator residue, sewage, garbage, sewage sludge, munitions, chemical wastes, biological materials, radioactive materials, heat, wrecked or discarded equipment, rock, sand, cellar dirt and industrial, municipal, and agricultural waste discharged into water." 33 U.S.C. § 1362(6).

   c.  "Discharge of a pollutant" is defined to include "any addition of any pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12).

   d.  "Point source" is defined as "any discernible, confined, and discrete conveyance, including but not limited to, any pipe, ditch, channel, tunnel, conduit, well,

discrete fissure, container, rolling stock, concentrated animal feeding operation, or

vessel or other floating craft, from which pollutants are or may be discharged."

33 U.S.C. § 1362(14).

e.  "Navigable waters" is defined as "the waters of the United States, including the

territorial seas."  33 U.S.C. § 1362(7).

18.    Under Section 402(b) of the CWA, 33 U.S.C. § 1342(b), a state may establish and

administer its own NPDES program with EPA's approval.  On August 27, 1996, EPA approved

the LPDES program, which is administered by LDEQ.

19.    NPDES and LPDES permits include what the CWA refers to as "effluent

limitations," which are provisions that specify the quantities of enumerated pollutants that may

be discharged under the permit.  33 U.S.C. § 1362(11).  The permits also commonly set out other

conditions and requirements that the permitholder must satisfy, including testing, record-

keeping, and reporting requirements, among others.

20.    Failure to comply with an NPDES or LPDES permit is a violation of the CWA.

33 U.S.C. § 1319.  EPA may issue a compliance order or bring a civil suit in federal district court

against any person who violates the conditions or requirements of a permit.  *Id.*

21.    Violations are subject to an inflation-adjusted civil penalty of up to $68,445 per

day for each violation.  33 U.S.C. § 1319(d); s*ee also* 40 C.F.R. § 19.4 (providing the current

inflation-adjusted penalty rates for penalties assessed on or after January 8, 2025, as mandated

through the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015); 90

Fed. Reg. 1375 (Jan. 8, 2025) (further explaining the mandated inflation adjustments).  EPA is

also authorized to seek a permanent or temporary injunction.  33 U.S.C. § 1319(b).

II.     **Failure to Comply with an LPDES Permit Also Violates the Louisiana Environmental Quality Act**

22.     The LEQA shares a similar purpose to the CWA.  *See* La. R.S. § 30:2072 (recognizing that "the waters of the state of Louisiana are among the state's most important natural resources and their continued protection and safeguard is of vital concern to the citizens of this state.").

23.     Like the CWA, the LEQA includes a broad prohibition on the discharge of pollutants into waters of the state absent a permit.  La. R.S. § 30:2076(A)(1)(a) ("No person shall discharge or allow to be discharged into any waters of the state . . . [a]ny waste or any other substance of any kind that will tend to cause water pollution in violation of any rule, order, or regulation."); *see also* La. R.S. § 30:2075 ("No person shall conduct any activity which results in the discharge of any substance into the waters of the state without the appropriate permit, variance, or license required under the regulations of [LDEQ] adopted pursuant to this Chapter.").  "Waters of the state" is defined to include, among other things, surface waters within the state of Louisiana, including all rivers.  La. R.S. § 30:2073(9).

24.     Failure to comply with the terms of an LPDES permit violates the LEQA.  La. R.S. § 30:2076(A)(3) ("No person shall violate any rule or regulation adopted under this Chapter or the terms of any permit or order issued under authority of this Subtitle.")  Violations of the LEQA are subject to civil penalties of up to $32,500 for each day of violation.  La. R.S. § 30:2025(E)(1)(a).  In addition to penalties, LDEQ is authorized to seek a permanent or temporary injunction.  La. R.S. § 30:2025(C)(3).

**III.    Federal SPCC Regulations Require Facilities Subject to the Regulations to Develop and Implement Plans to Prevent and Control Oil Spills**

25.     In the CWA, Congress directed the President to issue regulations establishing procedures, methods, equipment, and other requirements to prevent discharges of oil and hazardous substances from, among other things, onshore facilities.  33 U.S.C. § 1321(j)(1)(C). EPA first promulgated regulations under that authority in 1973, and they are now found at 40 C.F.R. Part 112, Subparts A through C.

26.     SPCC regulations apply to "any owner or operator of a non-transportation-related onshore or offshore facility engaged in drilling, producing, gathering, storing, processing, refining, transferring, distributing, using, or consuming oil and oil products, which due to its location, could reasonably be expected to discharge oil in quantities that may be harmful . . . into or upon the navigable waters of the United States or adjoining shorelines . . . ."  40 C.F.R. § 112.1(b).  In addition, the facility must have an aggregate aboveground oil storage capacity greater than 1,320 gallons.  40 C.F.R. § 112.1(d)(2)(ii).

    a.    "Non-transportation related onshore and offshore facilities" is defined to include, among other things, "[w]aste treatment facilities."  40 C.F.R. Part 112, App'x A § ii(1)(H).

    b.    "Onshore facility" means "any facility of any kind located in, on, or under any land within the United States, other than submerged lands."  40 C.F.R. § 112.2.

    c.    "Oil" means "oil of any kind or in any form, including, but not limited to: fats, oils, or greases of animal, fish, or marine mammal origin; vegetable oils, including oils from seeds, nuts, fruits, or kernels; and, other oils and greases, including petroleum, fuel oil, sludge, synthetic oils, mineral oils, oil refuse, or oil mixed with wastes other than dredged spoil."  *Id.*

27. Under SPCC regulations, each owner or operator of a covered facility must develop and implement a written SPCC Plan describing the equipment, workforce, procedures, and steps to prevent, control, and provide adequate countermeasures to a discharge. 40 C.F.R. § 112.3. The SPCC regulations set forth requirements regarding what must be addressed in the SPCC Plan. *See, e.g.*, 40 C.F.R. § 112.7.

28. In addition to developing and implementing an SPCC Plan, the owner or operator of a covered facility must satisfy other requirements under the SPCC regulations designed to prevent and mitigate the effects of a potential spill, including, for example, providing appropriate containment to prevent a discharge, 40 C.F.R. § 112.7(c); conducting testing and inspection of aboveground storage containers, 40 C.F.R. § 112.8(c)(6); and providing adequate training to oil-handling personnel, 40 C.F.R. § 112.7(f).

29. The SPCC regulations were promulgated under the authority of CWA Section 311(j), 33 U.S.C. § 1321(j). As such, violations of SPCC regulations are subject to civil penalties of $59,114 per day per violation. 33 U.S.C. § 1321(b)(7)(C); 40 C.F.R. § 19.4 (inflation adjustments).

## IV. Qualifying Louisiana Facilities Must Also Satisfy State SPC Regulations

30. Each operator of a facility covered by Louisiana's SPC regulations must also prepare and implement a written SPC Plan. Louisiana's SPC requirements overlap significantly with federal SPCC requirements, and covered facilities may satisfy SPCC and SPC requirements together in a single combined SPCC/SPC Plan. LAC 33:IX.903(I).

31. SPC regulations apply to, among others, facilities with an aggregate aboveground oil storage capacity of greater than 1,320 gallons where "any activity is conducted which discharges or may result in the discharge of pollutants into waters of the state." LAC 33:IX.107; LAC 33:IX.903(C). SPC regulations include many of the same requirements to prevent and

control spills that are found in the SPCC regulations, including providing appropriate

containment to prevent a discharge, LAC 33:IX.907(D); conducting testing and inspection of

aboveground storage containers, LAC 33:IX.907(F)(4); and providing adequate training to oil-

handling personnel, LAC 33:IX.907(I).

32.     Violations of SPC regulations are subject to civil penalties of up to $32,500 for

each day of violation under the LEQA, and LDEQ is authorized to seek a permanent or

temporary injunction.  La. R.S. § 30:2025(E)(1)(a); La. R.S. § 30:2025(C)(3); *see* LAC

33:IX.501.

## V.     FRP Regulations Require Facilities Subject to the Regulations to Prepare and Submit Plans for Responding to Oil Spills

33.     In 1990, in the wake of the *Exxon Valdez* oil spill, Congress enacted the Oil

Pollution Act, which among other things, amended the CWA to require owners and operators of

certain oil-handling facilities to prepare and submit Facility Response Plans to the federal

government.  33 U.S.C. § 1321(j)(5).

34.     Specifically, according to regulations issued under Section 311(j) of the CWA, 33

U.S.C. § 1321(j), "the owner or operator of any non-transportation-related onshore facility that,

because of its location, could reasonably be expected to cause substantial harm to the

environment by discharging oil into or on the navigable waters or adjoining shorelines shall

prepare and submit a facility response plan to the [EPA] Regional Administrator" that meets

requirements set forth in 40 C.F.R. Part 112.  40 C.F.R. § 112.20(a).

a.   The definitions of "non-transportation related onshore and offshore facilities,"
     "onshore facility" and "oil" set forth above apply to both the SPCC and FRP
     regulations.  *See supra* ¶ 26.

b. A facility could "reasonably be expected to cause substantial harm to the environment by discharging oil into or on the navigable waters or adjoining shorelines" if, among other things, "[t]he facility transfers oil over water to or from vessels and has a total oil storage capacity greater than or equal to 42,000 gallons." 40 C.F.R. § 112.20(f)(1).

35.     Under the CWA, violations of FRP regulations are subject to civil penalties of $59,114 per day per violation. 33 U.S.C. § 1321(b)(7)(C); 40 C.F.R. § 19.4 (inflation adjustments).

## FACTUAL BACKGROUND

## I.     The Facility

36.     From approximately November 1, 2017, through at least January 24, 2023, ERR operated the Facility under LPDES Permit No. LA0125750.[1]  In applications submitted in connection with the Permit, ERR described the Facility as follows:  Wastewater arrived at the Facility by truck or barge, began treatment in a 66,000-gallon receiving tank, and was later transferred into a separate 66,000-gallon process tank.  From the process tank, the wastewater entered one of two "biodigesters," which used biological materials to break down pollutants in the wastewater.  The wastewater then flowed through a sand filter and a carbon filter before reaching a 44,000-gallon outfall tank.  After sampling and analysis at the outfall tank to ensure compliance with effluent limits, the processed wastewater was then discharged from the outfall tank through a pipe into the Mississippi River.

37.     As shown in Exhibit 1 (a site plan submitted with the permit application) and Exhibit 2 (an aerial image of the Facility on November 1, 2021), which are attached to this

---

[1] Frisard and Nungesser previously operated the Facility under a different business name, Evergreen Resources Recovery LLC, from approximately 2011 to 2017.

Complaint, the Facility was located on the west bank of the Mississippi River between the river

and the levee.  The receiving tank, process tank, and outfall tank were cylindrical metal tanks

adjacent to each other at the south end of the Facility.[2]  The Facility also included several large

rectangular frac tanks (which resemble rail cars) that were used to store and decant wastewater

before treatment.  A discharge pipe ran from the outfall tank underground and then underwater

for approximately 63 feet into the Mississippi River.

## II.     The Permit's Limitations, Requirements, and Conditions

38.     The Permit authorized ERR to discharge treated wastewater from the Facility only

in discrete batches and "in accordance with effluent limitations and monitoring requirements,

narrative requirements, other conditions, and standard conditions" set forth in the Permit.  Permit

at 4.[3]

39.     Under the Permit, ERR was authorized to treat and discharge only marine bilge

water, wash water from oilfield and marine equipment, industrial oily wastewater, slop

wastewater, washdown wastewater, and marine grey water.  The Permit specifically prohibited

ERR from discharging "wastewater from any other source and/or containing any other material"

without prior written approval from LDEQ.  Permit at 14 (Other Condition J).

40.     When wastewater arrived at the Facility, the Permit required ERR to analyze it

according to a "Waste Acceptance Procedures Plan" that ERR was required to develop and

implement, which was to detail "specific acceptance criteria, including comprehensive

procedures pertaining to the inspection and analyses of the incoming wastewater."  *Id.* at 17

(Other Condition L).  The Permit further required ERR to maintain a written log of incoming

---

[2] Exhibits 1 & 2 are oriented such that the south end of the facility is located at the top of the images.
[3] Citations to "Permit" refer to the 2017 LPDES Permit issued to ERR for the Facility, which is attached
hereto as Exhibit 3.

wastewater "containing the customer name, type of wastewater, amount of wastewater, monitoring data collected upon arrival, and any other pertinent information concerning the wastewater." *Id.*

41.    Before discharge, the Permit required ERR to test the wastewater for compliance with effluent limits across 20 parameters, including, for example, arsenic, mercury, oil and grease, pH, and total suspended solids. *Id.* at 8-9.  ERR was required to test the wastewater "once per batch during operation" to ensure compliance. *Id.* at 9.  The Permit defined a "batch" as "an accumulation of treated material that is then isolated from any further inflow." *Id.* at 12 (Other Condition I).  The Permit further specified that "[b]atch contents must be adequately represented by the sample," *id.*, and that "[s]amples and measurements taken for the purpose of monitoring shall be representative of the monitored activity." *Id.* at 23 (Standard Condition C.2). All monitoring tests were required to be conducted "according to test procedures approved under 40 CFR Part 136," which establishes uniform test procedures for the analysis of pollutants. *Id.* at 23 (Standard Condition C.5).

42.    The Permit required ERR to report the results of monitoring analyses in DMRs submitted to LDEQ through an online system. *Id.* at 2, 9 (Submittal/Action Requirements and Narrative Requirements).  The DMRs were required to be completed monthly and submitted to LDEQ on a quarterly basis. *Id.*  The Permit required ERR to report in the DMRs the monitoring results for each of the effluent limits set forth in the Permit, typically in a monthly average and daily maximum concentration. *Id.*

43.    In addition to monitoring for compliance with effluent limitations, the Permit also required ERR to accurately determine the volume of wastewater that it discharged from the Facility (referred to as "flow") and to report the monthly average flow and daily maximum flow

in its DMRs.  Specifically, the Permit provided that "[a]ppropriate flow measurement devices and methods consistent with accepted scientific practices shall be selected and used to ensure the accuracy and reliability of measurements of the volume of monitored discharges."  *Id.* at 24 (Standard Condition C.6).  The Permit further required the flow measurement device to be capable of measuring flows with a maximum deviation of no more than 10% from actual discharge rates.  *Id.*  ERR was required to report the monthly average flow and daily maximum flow on DMRs in millions of gallons per day (MGD).  *Id.* at 8.

44.     As an additional measure to prevent discharges that could contain unacceptable amounts of oil or other hazardous substances, the Permit required ERR to "[c]onduct daily observations to determine if a visible sheen is present at the outfall" and to "[k]eep a manual log recording the results of the daily visual observations."  *Id.* at 10 (Narrative Requirement N-4).

45.     In addition, ERR was generally prohibited from diverting waste streams from any portion of the treatment facility, which is known as a "bypass."  *Id.* at 21 (General Condition B.4).  ERR was required to give LDEQ notice of an anticipated bypass "if possible at least ten days before the date of the bypass."  *Id.*  For an unanticipated bypass, ERR was required to provide notice to LDEQ within 24 hours.  *Id.*

46.     The Permit further required ERR to "at all times properly operate and maintain all facilities and systems of treatment and control (and related appurtenances) which are installed or used by the permittee to achieve compliance with the conditions of this permit."  *Id.* at 20 (General Condition B.3).

### III.     The Inspection of the Facility and Subsequent Investigation

47.     From January 24, 2023, through January 26, 2023, EPA and LDEQ conducted an unannounced inspection of the Facility for compliance with the Permit, as well as SPCC, SPC,

and FRP regulations.  Andrew Frisard met with the inspectors on behalf of ERR during the inspection and provided additional documents to EPA and LDEQ following the inspection.

### A.     LPDES Permit Inspection

48.     During a tour of the Facility, the inspectors observed that ERR was bypassing the 66,000-gallon receiving tank, which had been out of service for at least 21 months due to a leaking band.  Instead of wastewater beginning treatment in the receiving tank and then moving into the process tank, as described in ERR's permit application, ERR was instead pumping wastewater directly from various storage and decanting containers into a containment sump. From the containment sump, the wastewater was then pumped through a filter into the 66,000-gallon process tank.

49.     The inspectors also learned that ERR was bypassing one of its two biodigesters, which had been out of service for at least 12 months.  All wastewater was passing through the one operational biodigester rather than being split between the two biodigesters, as set forth in ERR's permit application.

50.     Before the inspection, ERR did not provide notice to LDEQ or EPA that it was bypassing the receiving tank or biodigester.

51.     The inspectors asked Frisard to pull a sample of the processed wastewater from the outfall tank, which is where the processed wastewater was stored and sampled for effluent analysis before discharge.  The sample that Frisard pulled was visibly polluted, greenish, and cloudy in appearance.  A photo of the sample taken during the inspection is attached to this Complaint as Exhibit 4.  After pulling the sample, Frisard stated that something must have gone wrong with the treatment and that the wastewater in the outfall tank would need to be treated again.

52.    Review of ERR's DMRs shows that for each month from January 2020 through June 2022, ERR reported a monthly average flow of 300 MGD on its DMRs, or approximately 9 billion gallons of wastewater discharged per month.  Conversely, for each month from July 2022 to December 2022, ERR reported a monthly average flow of .023 MGD on its DMRs, or approximately 690,000 gallons per month.

53.    Frisard admitted during the inspection that, in fact, ERR did not measure or calculate flow.  Instead, Frisard stated that he had "field notes with estimates of actual discharge flows."  Frisard further explained that the outfall tank is 44,000 gallons and that ERR discharged approximately one tank per month.  According to Frisard's notes and statements, ERR actually discharged an average of approximately 44,000 gallons per month, not 9 billion gallons per month or 690,000 gallons per month as ERR reported in its DMRs.

54.    ERR's records also reveal a large discrepancy between the amount of wastewater that ERR accepted for treatment and the amount that it tested before discharge and reported on its DMRs.

55.    During the inspection, Frisard stated that ERR documented wastewater that it accepted for treatment on "shipping manifests."  According to Frisard, ERR intended for these manifests to satisfy the requirement that the company maintain a written log of wastewater that it accepted for treatment at the Facility.  *See supra* ¶ 40.  According to the manifests, ERR accepted approximately 9,868,924 gallons of wastewater from January 1, 2019, through January 24, 2023.

56.    Based on Frisard's field notes, ERR discharged approximately 2,041,665 gallons of wastewater from January 1, 2019, through January 24, 2023.  This is consistent with Frisard's estimate that ERR discharged about one 44,000-gallon tank per month.  During the same period,

ERR sold approximately 282,222 gallons of recovered oil, and as of the inspection on January 24, 2023, ERR had approximately 1,860,500 gallons of wastewater and oil stored on site.

57.    This leaves approximately 5,684,537 gallons of wastewater that ERR apparently discharged but for which there is no record of any testing or authorized discharge.  Frisard's notes and ERR's DMRs also fail to account for these discharges.  Therefore, the information available indicates that ERR discharged more than 5 million gallons of wastewater into the Mississippi River without conducting required monitoring or analysis of the waste before discharge or reporting the discharges on its DMRs.  It is unknown whether any of these undisclosed wastewater discharges underwent complete, or any, treatment at the Facility prior to the unauthorized discharges into the river.

58.    In addition, ERR processed and discharged categories of wastewater that were not authorized by the Permit.  During the inspection, a tank barge and several intermodal tank containers were being cleaned at the Facility.  ERR accepted the wash water from these vessels for treatment and discharge, in violation of its Permit.  Likewise, ERR's manifests show that at various times between August 1, 2020, and January 24, 2023, ERR accepted and discharged other types of prohibited wastewater, including ParaQuat concentrate (a toxic herbicide), calcium bromide wash water, animal fat wash water, and petroleum contact water.

59.    The inspectors also observed significant problems with ERR's sampling and testing procedures.  Before sampling, ERR ran treated wastewater through an additional carbon filter located in the sample port of the outfall tank.  The wastewater that was ultimately discharged from the outfall tank did not pass through this filter.  Therefore, the sampled wastewater used for permit compliance purposes was not representative of ERR's actual discharges, which may have contained higher concentrations of pollutants than reflected in

ERR's monitoring analyses. The inspectors also observed that ERR was using litmus paper to measure pH, which is not an approved testing method under 40 C.F.R. Part 136. In addition, ERR failed to conduct daily visual observations at the discharge point to monitor for possible oil sheen in the river, and had no records of such observations, as required in the Permit.

### B.    SPCC/SPC and FRP Inspections

60.    During the SPCC/SPC component of the inspection, the inspectors observed that several 20,000-gallon frac tanks and a diesel tank at the Facility were positioned outside any secondary containment area or diversionary structures, in violation of SPCC and SPC regulations. In addition, ERR failed to maintain records of required inspections and tests of its storage vessels, including tests of the integrity of each aboveground container.

61.    Records reviewed during the inspection also revealed that ERR failed to provide training required under the SPCC and SPC regulations to oil-handling personnel, including training on operation and maintenance of equipment to prevent discharges; discharge procedure protocols; applicable pollution control laws, rules, and regulations; general facility operations; and the contents of the company's SPCC/SPC Plan.

62.    In addition, ERR's SPCC/SPC Plan suffered from numerous deficiencies, including failure to address (i) the type of oil and storage capacity for each fixed, mobile, or portable container, (ii) countermeasures for discharge, discovery, response, and cleanup, and (iii) methods of disposal for recovered materials. Likewise, ERR failed to amend the plan after significant physical changes to the Facility, including the addition of new storage tanks.

63.    During the inspection, the inspectors asked to review ERR's EPA Facility Response Plan. However, ERR failed to prepare or submit an FRP to EPA.

**CLAIM FOR RELIEF NO. 1**
**United States Claim for Permit Violations**
Discharge of Pollutants Without Required Monitoring and Analysis
(Civil Penalties and Injunctive Relief)
33 U.S.C. § 1319(b) and (d)

64.    Paragraphs 1 through 63 of this Complaint are re-alleged and incorporated by reference.

65.    From January 1, 2019, to January 24, 2023, ERR illegally discharged approximately 5,684,537 gallons of wastewater into the Mississippi River without conducting required monitoring or analysis of the wastewater before discharge.  ERR also failed to document and disclose these discharges in its DMRs.  Given that ERR's outfall tank has a maximum capacity of 44,000 gallons, this illegal discharge practice is equivalent to at least 129 discharge events of a full outfall tank.

66.    Each instance in which ERR failed to conduct required monitoring or analysis of wastewater before discharge or failed to document and incorporate the above-referenced discharges in its DMRs is a separate violation of the Permit for which relief may be granted under 33 U.S.C. § 1319(b) and (d).

67.    ERR is liable to the United States for civil penalties of up to $68,445 per day for each violation identified above pursuant to 33 U.S.C. § 1319(d).

68.    Injunctive relief pursuant to 33 U.S.C. § 1319(b) is also necessary to prevent ERR from engaging in further violations.

## CLAIM FOR RELIEF NO. 2
### United States Claim for Permit Violations
Treatment and Discharge of Prohibited Wastewaters
(Civil Penalties and Injunctive Relief)
33 U.S.C. § 1319(b) and (d)

69.     Paragraphs 1 through 63 of this Complaint are re-alleged and incorporated by reference.

70.     On or about January 24, 2023, ERR accepted wash water from cleaning a tank barge and several intermodal tank containers for treatment and discharge.  Likewise, ERR's manifests show that on approximately more than 200 occasions between August 1, 2020, and January 24, 2023, ERR accepted and discharged other types of wastewaters that ERR was not authorized to treat or discharge, including ParaQuat concentrate (a toxic herbicide), calcium bromide wash water, animal fat wash water, and petroleum contact water.

71.     Each instance in which ERR accepted or discharged wastewaters that it was not authorized to accept or discharge under the Permit is a separate violation of the Permit for which relief may be granted under 33 U.S.C. § 1319(b) and (d).

72.     ERR is liable to the United States for civil penalties of up to $68,445 per day for each violation identified above pursuant to 33 U.S.C. § 1319(d).

73.     Injunctive relief pursuant to 33 U.S.C. § 1319(b) is also necessary to prevent ERR from engaging in further violations.

## CLAIM FOR RELIEF NO. 3
### United States Claim for Permit Violations
Bypass and Failure to Properly Operate and Maintain Treatment Facilities
(Civil Penalties and Injunctive Relief)
33 U.S.C. § 1319(b) and (d)

74.     Paragraphs 1 through 63 of this Complaint are re-alleged and incorporated by reference.

75.     From approximately April 2021 until at least January 2023, ERR bypassed the Facility's receiving tank without providing notice to LDEQ or EPA.  From approximately January 2022 until at least January 2023, ERR bypassed one of the Facility's biodigesters without providing notice to LDEQ or EPA.

76.     In addition, ERR failed to properly operate and maintain its facilities and systems of treatment and control by allowing the receiving tank and biodigester to remain out of service for at least 21 months and 12 months, respectively.

77.     Each instance in which ERR bypassed the components of its treatment system identified above or failed to properly operate and maintain its facilities and systems of treatment as set forth above is a separate violation of the Permit for which relief may be granted under 33 U.S.C. § 1319(b) and (d).

78.     ERR is liable to the United States for civil penalties of up to $68,445 per day for each violation identified above pursuant to 33 U.S.C. § 1319(d).

79.     Injunctive relief pursuant to 33 U.S.C. § 1319(b) is also necessary to prevent ERR from engaging in further violations.

**CLAIM FOR RELIEF NO. 4**
**United States Claim for Permit Violations**
False Reporting of Flow Volume and Failure to Use Appropriate Flow Measurement Device
(Civil Penalties and Injunctive Relief)
33 U.S.C. § 1319(b) and (d)

80.     Paragraphs 1 through 63 of this Complaint are re-alleged and incorporated by reference.

81.     From approximately January 1, 2020, to June 30, 2022, ERR submitted false monthly DMRs indicating that the Facility's monthly average flow was 300 MGD, which is approximately 9 billion gallons per month.

82.    From approximately July 1, 2022, to December 31, 2022, ERR submitted false monthly DMRs indicating that the Facility's monthly average flow was .023 MDG, which is approximately 690,000 gallons per month.

83.    In fact, ERR did not calculate flow and did not employ a device capable of accurately measuring flow.

84.    Each instance in which ERR reported false monthly average flows in its DMRs or failed to use an appropriate flow measurement device is a separate violation of the Permit for which relief may be granted under 33 U.S.C. § 1319(b) and (d).

85.    ERR is liable to the United States for civil penalties of up to $68,445 per day for each violation identified above pursuant to 33 U.S.C. § 1319(d).

86.    Injunctive relief pursuant to 33 U.S.C. § 1319(b) is also necessary to prevent ERR from engaging in further violations.

**CLAIM FOR RELIEF NO. 5**
**United States Claim for Permit Violations**
Unrepresentative Sampling
(Civil Penalties and Injunctive Relief)
33 U.S.C. § 1319(b) and (d)

87.    Paragraphs 1 through 63 of this Complaint are re-alleged and incorporated by reference.

88.    From at least August 1, 2020, through January 26, 2023, ERR ran its wastewater samples through an additional carbon filter located in the Facility's outfall tank sample port before testing the sampled wastewater for compliance with effluent limitations.  The wastewater that was discharged from the outfall tank did not pass through this additional filter.  Therefore, the sampled wastewater was not representative of ERR's discharges, which may have contained higher concentrations of pollutants than reflected in ERR's monitoring analyses.

89.     Each instance in which ERR took, relied upon, or reported results of samples that were not representative of its actual wastewater discharges, as set forth above, is a separate violation of the Permit for which relief may be granted under 33 U.S.C. § 1319(b) and (d).

90.     ERR is liable to the United States for civil penalties of up to $68,445 per day for each violation identified above pursuant to 33 U.S.C. § 1319(d).

91.     Injunctive relief pursuant to 33 U.S.C. § 1319(b) is also necessary to prevent ERR from engaging in further violations.

**CLAIM FOR RELIEF NO. 6**
**United States Claim for Permit Violations**
Failure to Satisfy Testing and Observation Requirements
(Civil Penalties and Injunctive Relief)
33 U.S.C. § 1319(b) and (d)

92.     Paragraphs 1 through 63 of this Complaint are re-alleged and incorporated by reference.

93.     From at least August 1, 2020, through January 26, 2023, ERR used litmus paper to measure pH for compliance purposes, even though litmus paper was not an approved testing method under 40 C.F.R. Part 136.  During at least the same period, ERR failed to conduct visual observations of the outfall location and to maintain a written log of such visual observations.

94.     Each instance in which ERR failed to conduct the required testing, observation, and recordkeeping set forth above is a separate violation the Permit for which relief may be granted under 33 U.S.C. § 1319(b) and (d).

95.     ERR is liable to the United States for civil penalties of up to $68,445 per day for each violation identified above pursuant to 33 U.S.C. § 1319(d).

96.     Injunctive relief pursuant to 33 U.S.C. § 1319(b) is also necessary to prevent ERR from engaging in further violations.

**CLAIM FOR RELIEF NO. 7**
**Louisiana Claim for Permit Violations**
Discharge of Pollutants Without Required Monitoring and Analysis
(Civil Penalties and Injunctive Relief)
La. R.S. § 30:2076(A)(3)

97.     Paragraphs 1 through 68 of this Complaint are re-alleged and incorporated by reference.

98.     Each instance in which ERR failed to conduct required monitoring or analysis of wastewater before discharge or failed to document and incorporate the above-referenced discharges in its DMRs is a separate violation of the Permit for which relief may be granted under La. R.S. § 30:2076(A)(3).

99.     ERR is liable to LDEQ for civil penalties of up to $32,500 per day for each violation identified above pursuant to La. R.S. § 30:2025(E)(1)(a).

100.    Injunctive relief pursuant to La. R.S. § 30:2025(C)(3) is also necessary to prevent ERR from engaging in further violations.

**CLAIM FOR RELIEF NO. 8**
**Louisiana Claim for Permit Violations**
Treatment and Discharge of Prohibited Wastewaters
(Civil Penalties and Injunctive Relief)
La. R.S. § 30:2076(A)(3)

101.    Paragraphs 1 through 63 and 69 through 73 of this Complaint are re-alleged and incorporated by reference.

102.    Each instance in which ERR accepted or discharged wastewaters that it was not authorized to accept or discharge under the Permit is a separate violation of the Permit for which relief may be granted under La. R.S. § 30:2076(A)(3).

103.    ERR is liable to LDEQ for civil penalties of up to $32,500 per day for each violation identified above pursuant to La. R.S. § 30:2025(E)(1)(a).

**CLAIM FOR RELIEF NO. 9**
**Louisiana Claim for Permit Violations**
Bypass and Failure to Properly Operate and Maintain Treatment Facilities
(Civil Penalties and Injunctive Relief)
La. R.S. § 30:2076(A)(3)

104.    Paragraphs 1 through 63 and 74 through 79 of this Complaint are re-alleged and incorporated by reference.

105.    Each instance in which ERR bypassed the components of its treatment system identified above or failed to properly operate and maintain its facilities and systems of treatment as set forth above is a separate violation of the Permit for which relief may be granted under La. R.S. § 30:2076(A)(3).

106.    ERR is liable to LDEQ for civil penalties of up to $32,500 per day for each violation identified above pursuant to La. R.S. § 30:2025(E)(1)(a).

107.    Injunctive relief pursuant to La. R.S. § 30:2025(C)(3) is also necessary to prevent ERR from engaging in further violations.

**CLAIM FOR RELIEF NO. 10**
**Louisiana Claim for Permit Violations**
False Reporting of Flow Volume and Failure to Use Appropriate Flow Measurement Device
(Civil Penalties and Injunctive Relief)
La. R.S. § 30:2076(A)(3)

108.    Paragraphs 1 through 63 and 80 through 86 of this Complaint are re-alleged and incorporated by reference.

109.    Each instance in which ERR reported false monthly average flows in its DMRs or failed to use an appropriate flow measurement device is a separate violation of the Permit for which relief may be granted under La. R.S. § 30:2076(A)(3).

110.    ERR is liable to LDEQ for civil penalties of up to $32,500 per day for each violation identified above pursuant to La. R.S. § 30:2025(E)(1)(a).

25

111.    Injunctive relief pursuant to La. R.S. § 30:2025(C)(3) is also necessary to prevent ERR from engaging in further violations.

### CLAIM FOR RELIEF NO. 11
**Louisiana Claim for Permit Violations**
Unrepresentative Sampling
(Civil Penalties and Injunctive Relief)
La. R.S. § 30:2076(A)(3)

112.    Paragraphs 1 through 63 and 87 through 91 of this Complaint are re-alleged and incorporated by reference.

113.    Each instance in which ERR took, relied upon, or reported results of samples that were not representative of its actual wastewater discharges, as set forth above, is a separate violation of the Permit for which relief may be granted under La. R.S. § 30:2076(A)(3).

114.    ERR is liable to LDEQ for civil penalties of up to $32,500 per day for each violation identified above pursuant to La. R.S. § 30:2025(E)(1)(a).

115.    Injunctive relief pursuant to La. R.S. § 30:2025(C)(3) is also necessary to prevent ERR from engaging in further violations.

### CLAIM FOR RELIEF NO. 12
**Louisiana Claim for Permit Violations**
Failure to Satisfy Testing and Observation Requirements
(Civil Penalties and Injunctive Relief)
La. R.S. § 30:2076(A)(3)

116.    Paragraphs 1 through 63 and 92 through 96 of this Complaint are re-alleged and incorporated by reference.

117.    Each instance in which ERR failed to conduct the required testing, observation, and recordkeeping set forth above is a separate violation the Permit for which relief may be granted under La. R.S. § 30:2076(A)(3).

118.    ERR is liable to LDEQ for civil penalties of up to $32,500 per day for each violation identified above pursuant to La. R.S. § 30:2025(E)(1)(a).

119.    Injunctive relief pursuant to La. R.S. § 30:2025(C)(3) is also necessary to prevent ERR from engaging in further violations.

<b><u>CLAIM FOR RELIEF NO. 13</u></b><br/><b>United States Claim for FRP Violation</b><br/>Failure to Prepare and Submit a Facility Response Plan<br/>(Civil Penalties)<br/><u>40 C.F.R. § 112.20(a) and 33 U.S.C. § 1321(b)(7)(C)</u>

120.    Paragraphs 1 through 63 of this Complaint are re-alleged and incorporated by reference.

121.    At all times relevant to this Complaint, the Facility was a non-transportation-related onshore facility that, because of its location on the west bank of the Mississippi River, could reasonably be expected to cause substantial harm to the environment by discharging oil into or on navigable waters or adjoining shorelines.  The Facility transferred oil over water and as of January 24, 2023, had approximately 1,274,000 gallons of oil stored on site and approximately 586,100 gallons of wastewater stored on site, including oily wastewater. Therefore, ERR, as the owner or operator of the Facility, was required to prepare and submit an FRP to EPA that met the requirements set forth in 40 C.F.R. Part 112.  Prior to January 24, 2023, ERR did not prepare and submit an FRP to EPA.  As of the date of this Complaint, ERR still does not have a compliant FRP.

122.    ERR's failure to prepare and submit an FRP to EPA is a violation of 40 C.F.R. § 112.20(a).

123.    ERR is liable to the United States for civil penalties of up to $59,114 per day for each violation identified above under 33 U.S.C. § 1321(b)(7)(C).

**CLAIM FOR RELIEF NO. 14**
**United States Claim for SPCC Violations**
Failure to Provide Appropriate Containment and/or Diversionary Structures
(Civil Penalties and Injunctive Relief)
40 C.F.R. § 112.7(c) and 33 U.S.C. § 1321(b)(7)(C)

124.    Paragraphs 1 through 63 of this Complaint are re-alleged and incorporated by reference.

125.    At all times relevant to this Complaint, the Facility was a non-transportation-related onshore facility engaged in, among other things, gathering, storing, processing, transferring, and distributing oil and oil products.  Due to its location on the west bank of the Mississippi River, the Facility could reasonably be expected to discharge oil in quantities that may be harmful into or upon the navigable waters of the United States or adjoining shorelines. As of January 24, 2023, the Facility had approximately 1,274,000 gallons of oil stored on site and approximately 586,100 gallons of wastewater stored on site, including oily wastewater. Therefore, the SPCC regulations apply to the Facility.

126.    During the January 2023 inspection of the Facility, several 20,000-gallon frac tanks and a diesel tank were positioned outside any secondary containment area or diversionary structures, in violation of 40 C.F.R. § 112.7(c).

127.    ERR is liable to the United States for civil penalties of up to $59,114 per day for each violation identified above under 33 U.S.C. § 1321(b)(7)(C).

128.    Injunctive relief to ensure proper containment is also necessary, because ERR's storage of large quantities of oil and other waste on the bank of the Mississippi River without the required secondary containment poses an "imminent and substantial threat to the public health or welfare of the United States . . . because of an actual or threatened discharge of oil or a hazardous substance."  33 U.S.C. § 1321(e)(1).

**CLAIM FOR RELIEF NO. 15**
**United States Claim for SPCC Violations**
Failure to Conduct Required Tests and Maintain Testing Records
(Civil Penalties)
40 C.F.R. § 112.8(c)(6) and 33 U.S.C. § 1321(b)(7)(C)

129.    Paragraphs 1 through 63 and 125 of this Complaint are re-alleged and incorporated by reference.

130.    From approximately August 1, 2020, through at least as late as January 26, 2023, ERR failed to conduct inspections and tests of the aboveground storage vessels at the Facility and failed to maintain required records of such tests, in violation of 40 C.F.R. § 112.8(c)(6).

131.    ERR is liable to the United States for civil penalties of up to $59,114 per day for each violation identified above under 33 U.S.C. § 1321(b)(7)(C).

**CLAIM FOR RELIEF NO. 16**
**United States Claim for SPCC Violations**
Failure to Adequately Train Oil-handling Personnel
(Civil Penalties)
40 C.F.R. § 112.7(f) and 33 U.S.C. § 1321(b)(7)(C)

132.    Paragraphs 1 through 63 and 125 of this Complaint are re-alleged and incorporated by reference.

133.    From approximately August 1, 2020, through at least as late as January 26, 2023, ERR failed to provide required training to oil-handling personnel on (a) operation and maintenance of equipment to prevent discharges; (b) discharge procedure protocols; (c) applicable pollution control laws, rules, and regulations; (d) general facility operations; and (e) the contents of the company's SPCC Plan.

134.    Each failure to provide required training to oil-handling personnel or to designate someone at the Facility as accountable for discharge prevention, as set forth above, is a violation of 40 C.F.R. § 112.7(f).

135.     ERR is liable to the United States for civil penalties of up to $59,114 per day for each violation identified above under 33 U.S.C. § 1321(b)(7)(C).

### CLAIM FOR RELIEF NO. 17
**United States Claim for SPCC Violations**
Failure to Amend SPCC Plan After Material Change to Facility
(Civil Penalties)
40 C.F.R. § 112.5 and 33 U.S.C. § 1321(b)(7)(C)

136.     Paragraphs 1 through 63 and 125 of this Complaint are re-alleged and incorporated by reference.

137.     From approximately August 1, 2020, through at least January 26, 2023, ERR failed to amend the Facility's SPCC Plan after significant physical changes to the Facility, including the addition of new storage tanks.

138.     ERR's failure to amend its SPCC Plan is a violation of 40 C.F.R. § 112.5.

139.     ERR is liable to the United States for civil penalties of up to $59,114 per day for each violation identified above under 33 U.S.C. § 1321(b)(7)(C).

### CLAIM FOR RELIEF NO. 18
**United States Claim for SPCC Violations**
Failure to Address Required Subjects in SPCC Plan
(Civil Penalties)
40 C.F.R. § 112.7(a)(3) and 33 U.S.C. § 1321(b)(7)(C)

140.     Paragraphs 1 through 63 and 125 of this Complaint are re-alleged and incorporated by reference.

141.     From approximately August 1, 2020, through at least January 26, 2023, ERR's SPCC Plan failed to adequately address the type of oil in each fixed container and its storage capacity; countermeasures for discharge discovery, response, and cleanup; and methods of disposal of recovered materials in accordance with applicable legal requirements.

142.    ERR's failure to adequately address the topics identified above in its SPCC Plan is a violation of 40 C.F.R. § 112.7(a)(3).

143.    ERR is liable to the United States for civil penalties of up to $59,114 per day for each violation identified above under 33 U.S.C. § 1321(b)(7)(C).

### CLAIM FOR RELIEF NO. 19
**Louisiana Claim for SPC Violations**
Failure to Provide Appropriate Containment and/or Diversionary Structures
(Civil Penalties)
LAC 33:IX.907.D and La. R.S. § 30:2076(A)(3)

144.    Paragraphs 1 through 63 and 124 through 128 of this Complaint are re-alleged and incorporated by reference.

145.    At all times relevant to this Complaint, the Facility was a site (1) where activity was conducted which discharged or may have resulted in the discharge of pollutants into waters of the state, and (2) with an aggregate aboveground oil storage capacity of more than 1,320 gallons.  Therefore, the SPC regulations apply to the Facility.

146.    During the January 2023 inspection of the Facility, several 20,000-gallon frac tanks and a diesel tank were positioned outside any secondary containment area or diversionary structures, in violation of LAC 33:IX.907.D.

147.    ERR is liable to LDEQ for civil penalties of up to $32,500 per day for each violation identified above pursuant to La. R.S. § 30:2025(E)(1)(a).

148.    Injunctive relief pursuant to La. R.S. § 30:2025(C)(3) is also necessary to ensure proper containment of the large quantities of oil and oily wastewater that ERR has stored adjacent to the Mississippi River.

**CLAIM FOR RELIEF NO. 20**
**Louisiana Claim for SPC Violations**
Failure to Conduct Required Tests and Maintain Testing Records
(Civil Penalties)
LAC 33:IX.907.F.4, LAC 33:IX.907.J, and La. R.S. § 30:2076(A)(3)

149.    Paragraphs 1 through 63, 129 through 131, and 145 of this Complaint are re-alleged and incorporated by reference.

150.    From approximately August 1, 2020, through at least as late as January 26, 2023, ERR failed to conduct inspections and tests of the aboveground storage vessels at the Facility and failed to maintain required records of such tests, in violation of LAC 33:IX.907.F.4 and LAC 33:IX.907.J.

151.    ERR is liable to LDEQ for civil penalties of up to $32,500 per day for each violation identified above pursuant to La. R.S. § 30:2025(E)(1)(a).

**CLAIM FOR RELIEF NO. 21**
**Louisiana Claim for SPC Violations**
Failure to Adequately Train Oil-handling Personnel
(Civil Penalties)
LAC 33:IX. 907.I and La. R.S. § 30:2076(A)(3)

152.    Paragraphs 1 through 63, 132 through 135, and 145 of this Complaint are re-alleged and incorporated by reference.

153.    From approximately August 1, 2020, through at least as late as January 26, 2023, ERR failed to provide required training to oil-handling personnel on (a) operation and maintenance of equipment to prevent discharges, and (b) applicable spill control rules and regulations.

154.    ERR is liable to LDEQ for civil penalties of up to $32,500 per day for each violation identified above pursuant to La. R.S. § 30:2025(E)(1)(a).

**CLAIM FOR RELIEF NO. 22**
**Louisiana Claim for SPC Violations**
Failure to Amend SPC Plan After Material Change to Facility
(Civil Penalties and Injunctive Relief)
LAC 33:IX.905.E and La. R.S. § 30:2076(A)(3)

155.    Paragraphs 1 through 63, 136 through 139, and 145 of this Complaint are re-alleged and incorporated by reference.

156.    From approximately August 1, 2020, through at least January 26, 2023, ERR failed to amend the Facility's SPC Plan after significant physical changes to the Facility, including the addition of new storage tanks, which rendered the existing plan inadequate by, among other things, failing to account for these tanks.  ERR's failure to amend its SPC Plan is a violation of LAC 33:IX.905.E.

157.    ERR is liable to LDEQ for civil penalties of up to $32,500 per day for each violation identified above pursuant to La. R.S. § 30:2025(E)(1)(a).

**CLAIM FOR RELIEF NO. 23**
**Louisiana Claim for SPC Violations**
Failure to Address Required Subjects in SPC Plan
(Civil Penalties and Injunctive Relief)
LAC 33:IX.907.B and La. R.S. § 30:2076(A)(3)

158.    Paragraphs 1 through 63, 140 through 143, and 145 of this Complaint are re-alleged and incorporated by reference.

159.    From approximately August 1, 2020, through at least January 26, 2023, ERR's SPC Plan failed to adequately address the identity, amount, and location of oil and oily water stored at the facility.  ERR stored oil and oily water in containers and locations not addressed in the SPC Plan.

160.    ERR is liable to LDEQ for civil penalties of up to $32,500 per day for each violation identified above pursuant to La. R.S. § 30:2025(E)(1)(a).

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court:

A.      Permanently enjoin ERR from any further violations of the CWA and LEQA;

B.      Order ERR to expeditiously complete all actions necessary to ensure that it complies with the CWA, the LEQA, and regulatory requirements under those laws;

C.      Impose civil penalties against ERR for up to the maximum amounts allowable under 33 U.S.C. §§ 1319(b) and 1321(b)(7)(C), and La. R.S. § 30:2025(E)(1)(a);

D.      Award Plaintiffs their costs and expenses incurred in this action; and

E.      Grant Plaintiffs such further relief as the Court may deem just and proper.

Respectfully submitted,

*For the United States of America*:

ADAM R.F. GUSTAFSON
Principal Deputy Assistant Attorney General

/s/ Thomas S. Rosso
THOMAS S. ROSSO (DC Bar # 241066)
Trial Attorney
Environmental Enforcement Section
Environment and Natural Resources Division
U.S. Department of Justice
P.O. Box 7611, Benjamin Franklin Station
Washington, D.C. 20044-7611
Thomas.Rosso@usdoj.gov
(202) 532-3166

DAVID I. COURCELLE
United States Attorney
Eastern District of Louisiana

/s/ Glenn K. Schreiber
GLENN K. SCHREIBER
Assistant U.S. Attorney
U.S. Attorney's Office
Eastern District of Louisiana
650 Poydras Street, Suite 1600
New Orleans, LA 70130
glenn.schreiber@usdoj.gov
(O) (504) 680-3093 | (C) (504) 421-2293

OF COUNSEL:
AUDREY BIMBI
Assistant Regional Counsel
U.S. Environmental Protection Agency
Region 6
1201 Elm Street
Dallas, TX 75270
Bimbi.Audrey@epa.gov

*For the Louisiana Department of Environmental Quality*:

/s/ Oscar Magee
Oscar Magee (La. Bar #32302) (Trial Attorney)
Jay Love (La. Bar #39601)
Jay Glorioso (La. Bar #28050)
Office of the Secretary
Legal Affairs Division
Louisiana Dept. of Environmental Quality
P.O. Box 4302
Baton Rouge, Louisiana 70821-4302
Phone: (225) 219-3985
Fax: (225) 219-4068
Oscar.Magee@la.gov
Jay.Love2@la.gov
Jay.Glorioso@la.gov